# In the United States Court of Federal Claims

No. 13-636C
(Filed Under Seal: January 13, 2014)
(Reissued: January 23, 2014)[1]

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |
|---|---|
| SENTRILLION CORPORATION, | |
| Plaintiff, | |
| v. | Post-Award Bid Protest; Evidence of Partnership; Partnering Agreement; Unstated Evaluation Factor; Unequal Treatment; Meaningful Discussions; Prejudice. |
| THE UNITED STATES, | |
| Defendant, | |
| and | |
| TYCO INTEGRATED SECURITY, LLC, | |
| Intervenor. | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

    Richard J. Webber, Arent Fox LLP, Washington, D.C., for Plaintiff.  Patrick R. Quigley and Christopher A. Bowen, Arent Fox LLP, Washington, D.C., of Counsel.

    Stuart F. Delery, Bryant G. Snee, Deborah A. Bynum and P. Davis Oliver, U.S. Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., for Defendant.

    Kevin J. Maynard, Wiley Rein LLP, Washington, D.C., for Intervenor.  Rand L. Allen, Bryan G. Walsh, Stacie L. Gonsalves and Laura E. Sherman, Wiley Rein LLP, Washington, D.C., of Counsel.

---

**OPINION AND ORDER**

---

[1] This opinion was issued under seal on January 13, 2014.  On January 22, 2014, the parties filed a Joint Notice Regarding Proposed Redactions to Court's Opinion and Order, proposing one redaction.  The court publishes this opinion adopting the proposed redaction.

**Williams**, **Judge.**

In this bid protest, Sentrillion Corporation ("Sentrillion") challenges the United States Marshals Service's ("USMS") award of a contract to Tyco Integrated Security, LLC ("Tyco") for security services in Federal courthouses and USMS facilities throughout the United States. Sentrillion contends that USMS erred in concluding that Sentrillion failed to satisfy the requirements for partnership agreements and business licenses. Additionally, Sentrillion contends that USMS treated Sentrillion and Tyco unequally, applied unstated evaluation criteria, and failed to conduct meaningful discussions. Claiming it was the lowest priced technically acceptable offeror, Sentrillion asks the Court to direct award to it.

This matter comes before the Court on the parties' cross-motions for judgment on the administrative record ("AR"). Because Sentrillion has failed to demonstrate that USMS's decision to award the contract to Tyco was improper, the Court grants Defendant's and Intervenor's cross-motions for judgment on the AR.[2]

## **Findings of Fact**[3]

### **The Solicitation**

On April 5, 2012, USMS issued solicitation number DJMS-12-R-0011 seeking security services for approximately 900 judicial and USMS facilities throughout all 50 states and the organized United States territories. AR Tab 2 at 6, 17. Specifically, the awardee was to "provide all management, supervision, manpower, materials, supplies, and equipment necessary to plan, schedule, coordinate, and assure effective performance of" security systems in judicial and USMS facilities. Id. at 11, 17. USMS sought security services in one or more of three geographical regions -- Eastern, Central, and Western. Id. at 18. Any offeror who wished to bid on all three geographical regions could submit a nationwide proposal, in addition to proposals covering the separate regions. Id. at 137.

Offerors were to submit their proposals in the following five sections: (I) Certification Package, (II) Technical Submission, (III) Past Performance, (IV) Price Proposal, and (V) Business Proposal. Id. at 137-39. The Technical Submission section included six technical subfactors for evaluation: (1) Ability to Meet Response Requirements, (2) Asset Management, Project and Maintenance Management System, (3) Business Licenses, (4) Operational Program Team Qualifications, (5) Training, and (6) Corporate Experience. Id. at 137-38.

The solicitation called for the use of lowest price technically acceptable source selection in accordance with Federal Acquisition Regulation ("FAR") 15.101-2. Id. at 144; AR Tab 16 at 66379. As such, all the non-price sections would be rated as either "Acceptable" or "Unacceptable." AR Tab 2 at 143-45. Only proposals rated "Acceptable" under all the non-price factors would then be evaluated for price. Id. at 145. USMS would issue up to three

---

[2] This opinion confirms and explains an oral ruling issued on December 30, 2013.

[3] These findings of fact are derived from the Administrative Record.

regional Indefinite-Delivery/Indefinite-Quantity ("IDIQ") contracts or one nationwide IDIQ contract to offerors with the "lowest evaluated price . . . meeting or exceeding the acceptability standards for non-cost factors." Id.; see also AR Tab 16 at 66379.

**The Requirements for Business Licenses and Partnership Agreements**

Under the Technical Submission factor, the solicitation required offerors to submit business licenses, or an application for such licenses, stating:

> The Contractor must secure and maintain in a current status all required licenses and permits applicable to the lawful functioning within the locations listed in Attachments A, B, C and D [for the facilities covered under the solicitation in the Central Region, Eastern Region, Western Region, and Nationwide, respectively] – Tab 6. In doing so, the Contractor must furnish evidence to the Contracting Officer of a company license (state and/or local) authorizing the company to provide security installation services within that state and/or locality, or evidence of application for same with [its] proposal.

AR Tab 2 at 138. Amendment 1 to the solicitation expounded upon this requirement in a question-and-answer exchange, requiring "evidence of a partnership" from offerors planning on cooperating with other companies to provide services:

> [Question:] According to the interpretation of the Licenses requirement stated [above], are you specifying that the contractor and its team member, which consist of other contractors are to provide its licenses? I would appreciate your prompt response to this question, so we can begin collecting the licenses from our other team members. Can you please clarify?
>
> [Answer:] Yes, license information must be submitted as evidence that the Contractor is authorized to provide security installation services within the state and/or locality, or evidence of application for the same with their proposal. <u>If partnered with other companies to perform the work, then their license is to be submitted along with evidence of a partnership to provide services.</u> [Section] H-7 [of the solicitation] has been modified to remove the reference to "permits".

AR Tab 3 at 8378 (emphasis added).

Amendment 3 to the solicitation revised the Business Licenses subfactor further to add the following: "[t]he Prime and any subcontractors are required to be licensed to provide security installation services in the states in which they propose to provide service under this contract. Offeror must furnish evidence of a company state license." AR Tab 5 at 17792. The solicitation contained no additional information concerning the need to provide "evidence of partnership to provide services."

Under the Ability to Meet Response Requirements subfactor, the solicitation provided:

> For each Regional and/or Nationwide submission, the USMS will evaluate the Offeror's written narrative explaining how response times identified in the

3

> Statement of Work shall be met. The narrative must provide sufficient and convincing details that demonstrate the Offeror's ability to meet all response requirements identified. Failure to provide sufficient detail to enable the Government to thoroughly evaluate the Offeror's ability to satisfy the requirements specified may result in a rating of unacceptable and the proposal shall be excluded from further consideration.

Id. at 17805.

**Early Submission Rounds, Evaluation, and Discussions**

On June 6, 2012, USMS received proposals from four offerors -- Sentrillion, Tyco, Diebold, Incorporated ("Diebold"), and KS International ("KSI") -- for each of the three geographic regions. AR Tab 47 at 70390; see AR Tab 19 at 67063. All offerors, except Sentrillion, submitted a nationwide proposal in this round. AR Tab 47 at 70390; see also AR Tab 19 at 67065-66. Because USMS amended the solicitation nine times after the submission of proposals, USMS called on offerors to submit revised proposals by October 12, 2012, if necessary. AR Tab 47 at 70390; see also AR Tabs 7-15. Both Sentrillion and Tyco submitted revised proposals. AR Tab 17e at 66919; AR Tab 48 at 70402.

In evaluating the technical subfactors, the Technical Evaluation Board ("TEB") found Tyco's proposals acceptable for all subfactors in every geographical region. See AR Tab 19 at 67063-65. The TEB rated Sentrillion's proposals "Unacceptable" under the Business Licenses subfactor in all three regions, citing Sentrillion's failure to provide all required business licenses "for the prime or subcontractors/partners identified to perform services in each of the states and territories . . . ." AR Tab 18a at 66922; AR Tab 18b at 66970; AR Tab 18c at 67019; see also AR Tab 19 at 67063-64. In particular, "Sentrillion had only provided one license per state and in each case it was for the first company listed." See AR Tab 25a at 67651; AR Tab 25b at 67695; AR Tab 25c at 67738. Specifically, Sentrillion had provided either one business license from itself -- without any subcontractor licenses -- or one license from a single subcontractor -- without licenses from others working in the location. See, e.g., AR Tab 17c at 66792-839. The TEB also rated Sentrillion's proposals "Unacceptable" under the "Operational Program Team Qualifications" technical subfactor in this round. AR Tab 19 at 67063-64.

On November 5, 2012, USMS decided to conduct discussions with all offerors in the competitive range. Id. at 67066. USMS concluded that Sentrillion was in the competitive range because Sentrillion could receive an "Acceptable" rating for all subfactors by providing additional information. Id. at 67065. After removing KSI from the competitive range based upon its rating of "Unacceptable" for "Past Performance" and "Corporate Experience," USMS provided the remaining three offerors with discussion letters. Id. at 67065-66; see also, e.g., AR Tab 22 at 67086-90.

In its discussion letter regarding the Business Licenses subfactor, USMS informed Sentrillion that it failed to submit all the required business licenses, stating:

> Section H-7 of the Solicitation [as] further clarified in Amendments 0001 and 0003, requires the contractor to demonstrate the ability to provide security

4

>installation services in every state in the region by providing a current company license or the application for a company license for each state in the region. Furthermore, any subcontractors or partners identified as performing any part of the contract in a particular state must also provide a current company license or an application for a company license for that state.

AR Tab 22 at 67089.

On November 15, 2012, Sentrillion submitted its proposal revisions, and detailed the locations where Sentrillion proposed using team members. E.g., AR Tab 24a at 67112; AR Tab 24b at 67269-70; AR Tab 24c at 67469. Tyco also submitted its proposal revisions on November 15, 2013. AR Tab 52a at 71956; AR Tab 52b at 72251; AR Tab 52c at 72536; AR Tab 52d at 72829. In its nationwide proposal revision, Tyco offered to use four subcontractors in five locations. AR Tab 52d at 72905. Three of the subcontractors submitted letters entitled "Evidence of Contract to Provide Services" explaining that they were "currently under contract to provide maintenance and other security services" as Tyco's subcontractors. Id. at 73049, 73062, 73161. The remaining subcontractor [redacted] did not include a letter, but provided its business licenses for Guam and the Northern Mariana Islands. Id. at 73193-14, 73205.

The TEB found Sentrillion's proposals "Unacceptable" under the Ability to Meet Response Requirements and Business Licenses subfactors because Sentrillion failed to provide fully completed business license applications for many locations. AR Tab 25a at 67651-52; AR Tab 25b at 67695-96; AR Tab 25c at 67738-39. After eliminating Sentrillion from the competition based on TEB's evaluation of Sentrillion's offer, USMS found that Tyco had an acceptable offer with the lowest price. AR Tab 28 at 67819-21, 67839; AR Tab 29 at 67480. On December 27, 2012, USMS awarded the contract to Tyco as the lowest priced technically acceptable offeror. AR Tab 47 at 70392; AR Tab 30 at 67841-42.

**The GAO Protest**

On January 11, 2013, Sentrillion filed a bid protest with the Government Accountability Office ("GAO"). AR Tab 47 at 70392. GAO sustained the protest, finding that USMS did not conduct meaningful discussions with Sentrillion because USMS failed to raise its concerns with the completeness of some of Sentrillion's business license applications. Id. at 70394-95. As such, GAO recommended that USMS reopen the bidding process, conduct meaningful discussions, permit offerors to submit revised proposals, and make a new source selection. Id. at 70398.

**The Reopening of the Competition**

On May 7, 2013, USMS reopened the competition and issued discussion letters to the offerors based on GAO's recommendation. AR Tab 40 at 70289; see also AR Tab 53; AR Tab 53a. The discussion letters sent to Sentrillion and Tyco both stated that "[t]his letter constitutes the only discussions that will occur in accordance with FAR 15.306(d), as the USMS intends to make award without further revisions." AR Tab 53 at 73504; AR Tab 53a at 73506.2. In its letter to Sentrillion, under the Ability to Meet Response Requirements subfactor, USMS explained that Sentrillion needed to provide a consistent narrative:

5

> The information provided must be consistent throughout the narrative and not contradict information provided elsewhere. For instance, the Sentrillion Team listing of subcontractors/partners should not differ from the partnering information, as a company state license or application for the same authorizing the company to provide security installation services within a location is required for all companies proposed to perform work under this contract.

AR Tab 53 at 73504. Further, under the Business Licenses subfactor, the letter required as follows:

> Sentrillion must submit a company state license authorizing the company to provide security installation services within that state or territory, or evidence of application for the same at the time of final proposal revision. <u>If partnered with other companies to perform the work, then their license or application must be submitted along with evidence of a partnership agreement to provide services. License must be current, applications must contain all required information per the application instructions, and signed partnering agreements must be included at the time final proposals are submitted.</u> . . . Failure to provide the required information will result in a rating of unacceptable and the proposal shall be excluded from further consideration.

<u>Id.</u> at 73505 (emphasis added). USMS's discussion letter to Tyco provided the same language for the Business Licenses subfactor and included no additional information concerning the need for partnership agreements. AR Tab 53a at 73506.2.

**<u>Sentrillion's Proposals and Teaming Agreements</u>**

On May 30, 2013, Sentrillion submitted final revised proposals for each geographical region and, for the first time, a nationwide proposal, adding Diebold to its list of team members. AR Tab 37 at 68468-70; AR Tab 38c at 69175-76.[4] The Sentrillion Team covered "the entire nation" with team members in "a range of two (2) to 50 miles . . . from USMS facilities." AR Tab 38c at 69164. Sentrillion's proposals contained "teaming agreements" with its team members that provided the parties would enter into good faith negotiations to form a subcontract if Sentrillion were awarded the USMS contract. <u>Id.</u> at 69713-865. For example, the Sentrillion/Diebold teaming agreement stated:

> As a result of the Procurement, if the Government awards a contract to Sentrillion, Sentrillion and Teaming Member will enter into good faith negotiations with the intent of entering into a mutually acceptable subcontract agreement. The Parties will undertake reasonable efforts that such subcontract agreement will incorporate the responsibilities identified in <u>Exhibit A</u> of this Agreement [providing a description of the services Diebold would perform], as amended. Notwithstanding, the Parties agree that the period for good faith

---

[4] After the GAO protest, Diebold decided to team with Sentrillion rather than submit its own proposals. AR Tab 40 at 70289; AR Tab 38c at 69171-73.

6

>   negotiation of said subcontract agreement shall not exceed sixty (60) days from the date of award. Further, if Sentrillion and Teaming Member cannot reach an agreement within said period for negotiation, Sentrillion shall be free to contract with another source.

Id. at 69794. Sentrillion proposed using a total of 53 subcontractors to provide services throughout the United States, offering one or more subcontractors in every location covered by the solicitation. Id. at 69710-11, 69171-73. Diebold would provide Sentrillion support in all 50 states, the District of Columbia, Guam, and Puerto Rico. Id. at 69711.

**Tyco's Proposals and Master Agreements**

Tyco submitted its final nationwide and regional proposals on May 30, 2013. AR Tabs 54a, 54b, 54c, 54d. In response to its discussion letter requiring "signed partnering agreements" as "evidence of a partnership agreement to provide services," Tyco submitted four "master agreements" with its four proposed subcontractors. AR Tab 54d at 74639-46, 74654-62, 74741-51, 74785-95. Tyco proposed using subcontractors in Minnesota, Nebraska, the Virgin Islands, the Northern Mariana Islands, and Guam. Id. at 74502. In all other locations, Tyco offered to provide services itself. See id. at 74502, 74602-820. These master agreements controlled the ongoing relationship between Tyco and its subcontractors, including future work orders. For example, the November 1, 2012 subcontracting agreement covering Minnesota was to be renewed automatically every year and provided: "[t]his Agreement shall operate as a master agreement and shall govern all present and future transactions entered into by Tyco . . . and Subcontractor for the services described in this Agreement." Id. at 74639. Services covered by the master agreements encompassed the solicitation's installation, maintenance, and repair service requirements. Compare id. at 74639, 74654, 74741, 74785 with AR Tab 2 at 17.

Statements of work ("SOWs") would delineate future work requests under the master agreements, including any requests related to providing services for USMS. AR Tab 54d at 74639, 74654, 74741, 74785. The subcontracting agreement covering Minnesota, for example, provided:

>   Individual future requests for Subcontractor Services will be initiated by the issuance of [a] written SOW by an authorized Tyco representative and such transactions shall become effective when the SOW is accepted by Subcontractor. Subcontractor acknowledges and agrees that Tyco shall have no obligation to issue any SOWs or otherwise retain Subcontractor to provide goods or services.

AR Tab 54d at 74639. The three other subcontracts included similar language to this provision but omitted the second sentence, stating: "[i]ndividual future requests for Subcontractor Services will be initiated by the issuance of [a] written Work Order as defined in Exhibit C by an authorized ADT Service or Installation Manager and such transactions shall become effective when the Work Order is accepted by Subcontractor." Id. at 74654, 74741, 74785. The master agreements provided the general terms and conditions of the subcontracting relationship, recognizing that SOWs from Tyco would define the specific services the subcontractor would provide. See, e.g., id. at 74639-46. The master agreements further provided that each

subcontractor would be paid $100 "for its undertaking the obligation to perform," if the subcontractor never rendered services for Tyco. Id. at 74639, 74654, 74742, 74785.

**The Evaluation**

The TEB found Sentrillion's proposals "Unacceptable" under the Ability to Meet Response Requirements and the Business Licenses technical subfactors. AR Tab 36 at 68445. Under the Ability to Meet Response Requirements subfactor, the TEB found that the lack of binding partnership agreements called into doubt Sentrillion's ability to satisfy the solicitation's requirements. For instance, the TEB's evaluation for the Eastern region noted:

> However, the TEB found that none of the companies with which Sentrillion had entered into "teaming agreements" ([including] Diebold, upon which Sentrillion relies heavily to demonstrate its ability to meet response requirements) is legally committed to provide services in the event Sentrillion is awarded the contract. The teaming agreements submitted indicate nothing more than an "agreement to negotiate."

Id. at 68448.[5] The TEB found all of Sentrillion's agreements with its subcontractors in every region nonbinding. Id. at 68445, 68448, 68455, 68462.

The TEB described why Sentrillion's submitted agreements were unacceptable to satisfy the solicitation's response time requirements and why finalized partnership agreements were necessary to meet the Ability to Meet Response Requirements subfactor, stating:

> All of these agreements permit the offeror to not engage the teaming member if, after specific periods of negotiation (45/60 days respectively), the parties fail to reach an agreement. This permits the offeror to "be free to contract with an alternate/another source." This may include companies not previously submitted nor found to be acceptable in meeting the distance and response requirements of the solicitation.
>
> Sentrillion relies heavily upon its potential "team" members in attempting to demonstrate by convincing and sufficient evidence that it is capable of meeting the response requirements of Technical [Subfactor] 1. Its purported "regional footprint" is [overwhelmingly] based upon vendors who are not contractually obligated to perform required services. On page 53 of its resubmission, Sentrillion states that "[i]n most cases, Diebold, with its nationwide technical response capability and over 4,000 technicians readily available for dispatch, will serve as the primary dispatch support to service the USMS' facilities in R1."
>
> In addition, the delay for Sentrillion to determine which technicians are going to be utilized will delay the transition period from the incumbent contractor. The information they have provided states they will be engaged in negotiations with

---

[5] Each individual regional evaluation -- Eastern, Central, and Western regions -- provided the same explanation for unacceptability. AR Tab 36 at 68445, 68448, 68455, 68462.

> their potential partner companies for up to the first 60 days following award (with no guarantee that an agreement will be reached). This crucial time is needed by the USMS to conduct the necessary background investigations of the personnel who will be performing under the contract . . . .
>
> For all of these reasons, individually and taken together, the TEB has determined Sentrillion has not provided sufficient and convincing evidence that it alone will be capable of responding in a timely fashion to requests for service. Therefore, Sentrillion's proposal on Technical Evaluation [Subfactor] 1 is technically unacceptable.

Id. at 68449 (third alteration in original).

In finding Sentrillion's proposals under the Business Licenses subfactor unacceptable, the TEB stated:

> However, the TEB has identified significant issues with the "teaming agreements" with the other security companies. The discussion letter of May 7, 2013, stated that "[i]f partnered with other companies to perform the work, then their license or application must be submitted along with evidence of a partnership agreement to provide services. Instead of providing partnership agreements, Sentrillion has provided purported "teaming agreements" that [are] merely "agreements to negotiate" with no guarantee that the proposed team member is ever going to be legally obligated to perform work under the contract.
>
> The . . . teaming agreements are merely agreements to enter into negotiations as opposed to agreements to partner with and provide services which are currently in force or executable upon award . . . .

Id. at 68450-51 (first alteration in original).

The TEB also found that the solicitation required Sentrillion to provide its own business licenses for every state and territory, not just in the states where Sentrillion proposed to do work itself. The TEB stated:

> The intent of requiring the prime to be licensed in every state and for partnership agreements to be submitted in addition to licenses for any subcontractors proposed was for the offeror to demonstrate the ability to provide the services required in the solicitation in the defined region. Sentrillion has not provided proof it possesses a current license nor has it submitted a completed application for every state listed in region 1. The issues raised . . . with the purported "teaming agreements" places the government at significant and unacceptable risk.
>
> As Sentrillion has on each of its three technical submissions materially changed the structure of its "regional footprint", the TEB members have concerns that Sentrillion may yet again change "team members" to include companies other than those for which they have submitted proof of licensure. The companies they subsequently select may not be adequately licensed to perform the work required

9

in the solicitation and may not have been evaluated as acceptable by the government had they been submitted as part of this solicitation.

Id. at 68451-52.

USMS's Price Negotiation Memorandum expressed concern with Sentrillion's agreement with Diebold, stating:

The pricing submitted by Sentrillion in each proposal submission has been the lowest, while the pricing for Diebold in each of the previous submissions was by far the highest. The extreme price difference with these two vendors raises [a] question as to whether or not a "teaming agreement" could be executed, placing the government at significant and unacceptable risk.

AR Tab 40 at 70308. The TEB also identified issues with certain of Sentrillion's teaming agreements, such as a failure to list the state where services would be provided or to include a date on the teaming agreement. See, e.g., AR Tab 36 at 68451, 68458.

The TEB found Tyco's nationwide proposal technically acceptable, determining that Tyco's partnership agreements were properly executed under the terms of the solicitation. AR Tab 56 at 75262-64. Under the Business Licenses subfactor, the TEB found that "the submittal contained valid evidence of licensure (or completed applications) to perform security installation services and properly executed partnership agreements for each subcontractor/partner for states/territories for which they have indicated the subcontractor/partner will be providing services under the contract." Id. at 75255-56. After eliminating Sentrillion from the competition and deciding that Tyco was the only technically acceptable offeror, USMS awarded Tyco a nationwide contract on August 15, 2013. AR Tab 42 at 70336-38.

**Sentrillion's Debriefing and Bid Protest**

Sentrillion received a written debriefing from USMS on August 22, 2013, and filed a complaint in this Court on September 3, 2013. AR Tab 46 at 70354-85. In a telephonic status conference held on September 4, 2013, the Government agreed to stay the award of the contract during the pendency of the bid protest. Status Conference Tr. 5.

**Discussion**

**Jurisdiction and Standard of Review**

This Court has jurisdiction over this bid protest pursuant to the Tucker Act, 28 U.S.C. § 1491(b)(1). In a bid protest, the Court reviews the agency's procurement decision under the standards enunciated in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. 28 U.S.C. § 1491(b)(4) (2012); see also Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1373 (Fed. Cir. 2009); Gentex Corp. v. United States, 58 Fed. Cl. 634, 648 (2003). Pursuant to the APA, this Court may set aside an agency action that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5. U.S.C. § 706(2)(A) (2012); Ala. Aircraft Indus., 586 F.3d at 1373; Gentex, 58 Fed. Cl. at 648. Agency action is arbitrary

and capricious when the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Ala. Aircraft Indus., 586 F.3d at 1375 (alteration in the original) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)) (internal quotation marks omitted). An "agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." In re Sang-Su Lee, 277 F.3d 1338, 1344 (Fed. Cir. 2002) (quoting Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43) (internal quotation marks omitted).

"[I]f the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct." Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005); see also Afghan Am. Army Servs. Corp. v. United States, 106 Fed. Cl. 714, 723 (2012).

**The Grounds for Sentrillion's Protest**

Sentrillion contends that USMS erred in concluding that Sentrillion failed to satisfy the requirements for partnership agreements and business licenses. Additionally, Sentrillion contends that USMS treated Sentrillion and Tyco unequally, applied unstated evaluation criteria, and failed to conduct meaningful discussions.

**The Requirement for Partnership Agreements**

Sentrillion alleges that USMS improperly concluded that its teaming agreements did not meet the requirement for "evidence of a partnership" in the form of a "signed partnering agreement." Pl.'s Mot. for Judgment on the AR ("Pl.'s Mot.") 12-16. According to Sentrillion, the term "partnership agreement" or "partnering agreement" reasonably encompassed its agreements to negotiate subcontracting agreements if it were awarded the USMS contract. Id. at 14-15.

Sentrillion's interpretation of the requirement is untenable. The solicitation asked for evidence of partnerships to provide services if an offeror partnered with other companies under the Business Licenses subfactor. AR Tab 3 at 8378. USMS's May 7, 2013 discussion letters explained that to satisfy this requirement, offerors needed to provide "signed partnering agreements" at the time final proposals were submitted. AR Tab 53 at 73505; AR Tab 53a at 73506.2. This requirement was clear; it mandated actual agreements to provide services -- not preliminary agreements to negotiate that could later evaporate. AR Tab 53 at 73505; see also AR Tab 53a at 73506.2; cf. LaSalle Partners v. United States, 48 Fed. Cl. 797, 804-05 (2001) (finding that plaintiffs' letter expressing an intent to form a joint venture upon being awarded the contract failed to meet the solicitation's requirement for an "executed joint venture agreement").

The indeterminate agreements to negotiate that Sentrillion proffered as "teaming agreements" are a far cry from "signed partnering agreements." For example, Sentrillion's teaming agreement with Diebold -- the proposed subcontractor on which Sentrillion most heavily relied -- stated that the parties would enter into "good faith negotiations with the intent of entering into a mutually acceptable subcontract agreement" if Sentrillion were awarded the

contract. AR Tab 38c at 69794; see also id. at 69710-865. This agreement's nonbinding nature was plain, providing: "if Sentrillion and Teaming Member cannot reach an agreement within said period for negotiation [60 days], Sentrillion shall be free to contract with another source." Id. at 69794. The teaming agreements provided no assurance that team members would actually perform any services or that any particular subcontractor -- whose licenses or applications had been provided -- would carry out services in a given location.

Sentrillion also claims the Government's interpretation of the "partnership agreement" requirement was arbitrary and capricious, arguing that agencies "routinely" permit offerors to submit teaming agreements. While Sentrillion characterizes its agreements as teaming agreements -- an undefined term in this procurement -- what constitutes an acceptable agreement depends on the solicitation's stated requirements. Here, by offering agreements to negotiate, Sentrillion ignored the solicitation and discussion letter requirement for evidence of partnerships in the form of signed partnering agreements.

Sentrillion further contends that USMS speculated that Sentrillion would not succeed in negotiating subcontracts with its team members. Pl.'s Mot. 19. In so arguing, Sentrillion ignores the fundamental precept that it is an offeror's responsibility to demonstrate that its proposals comply with the solicitation's mandatory requirements to be technically acceptable. L-3 Global Commc'ns Solutions v. United States, 82 Fed. Cl. 604, 609 (2008) (citing E.W. Bliss Co. v. United States, 77 F.3d 445, 448-49 (Fed. Cir. 1996)).

Sentrillion also argues that USMS arbitrarily and capriciously considered Sentrillion's agreements with its subcontractors in rating its proposals "Unacceptable" under the Ability to Meet Response Requirements subfactor. Plaintiff's contention lacks merit. Under the Ability to Meet Response Requirements subfactor, USMS sought "sufficient and convincing details" concerning the offeror's ability to meet response times to perform security services. AR Tab 5 at 17805. USMS asked for a "written narrative explaining how response times identified in the Statement of Work shall be met." Id. USMS warned offerors that "[f]ailure to provide sufficient detail to enable the Government to thoroughly evaluate the . . . requirements specified may result in a rating of unacceptable . . . ." Id. In its nationwide proposal, Sentrillion explained that it would meet the response times in each geographical region using its "team" of subcontractors. AR Tab 38c at 69163. Sentrillion claimed that "[d]ue to [the team's] proximity to each USMS facility . . . the Sentrillion Team has the resource capability to respond to the USMS'[s] needs within the response requirements." Id. at 69164. Because Sentrillion relied so heavily on subcontractors to perform the work, USMS reasonably considered Sentrillion's relationship with its partners to evaluate Sentrillion's ability to meet response times. Id. at 69710-11.[6] The agency rationally concluded that due to Sentrillion's lack of binding partnership agreements, it did not demonstrate that it had a team in place that could meet the response times. AR Tab 36 at 68448-49, 68455-56, 68462-63.

Finally, Sentrillion contends that USMS's interpretation of the solicitation and May 7, 2013 discussion letters as requiring binding subcontracting agreements was unduly restrictive

---

[6] Sentrillion represented that it would self-perform in 18 states. Pl.'s Reply & Resp.to Cross-Mots. 1.

and unreasonable given that pricing could become obsolete or a subcontractor's small business status could change between the time of proposal and award. Pl.'s Mot. 17. This requirement, however, clearly had a rational relationship to the agency's needs. See ABF Freight Sys., Inc. v. United States, 55 Fed. Cl. 392, 395 (2003) (citing XTRA Lease, Inc. v. United States, 50 Fed. Cl. 612, 624 (2001)). By requiring finalized "partnering agreements," USMS could verify the identities of the companies set to perform security services in judicial and USMS facilities, ensure that all subcontractors were properly licensed to perform security services, and prevent an offeror from adding unapproved and unlicensed subcontractors post-award. See, e.g., AR Tab 36 at 68452. An agency rationally may ask to know who will be providing services under a contract, especially a contract for security services. See Beretta USA Corp., B-406376, 2013 CPD ¶ 186, 2013 WL 4431830, at *5 (Comp. Gen. July 12, 2013) (finding that an agency's decision to treat protester's teaming agreements as a deficiency was rational where the teaming agreements "did not provide a level of commitment to verify" performance of the contract). As such, USMS's interpretation of the solicitation and May 7, 2013 discussion letters was reasonable and not unduly restrictive.

### Sentrillion's Claim of an Unstated Evaluation Factor

Sentrillion contends that requiring binding subcontracting agreements was an unstated evaluation factor. To succeed in this argument, Sentrillion must show the procuring agency used a substantially different basis in evaluating its proposals than was disclosed, and that, as a result, the protester was prejudiced because it had a substantial chance to receive the award but for this hidden evaluation criterion. Banknote Corp. of America, Inc. v. United States, 56 Fed. Cl. 377, 387 (2003), aff'd, 365 F.3d 1345 (Fed. Cir. 2004); NEQ, LLC v. United States, 88 Fed. Cl. 38, 48 (2009). Here, under the Business Licenses subfactor, USMS announced the need for partnering agreements in the solicitation, requesting "evidence of a partnership to provide services." AR Tab 3 at 8378. In the May 7, 2013 discussion letters, USMS explained that requirement and asked for "signed partnering agreements" as "evidence of a partnership agreement to provide services." AR Tab 53 at 73505; AR Tab 53a at 73506.2; see also AR Tab 3 at 8378. The requirement for binding partnership agreements was a clearly and expressly stated evaluation criterion.

### Sentrillion's Allegation of Unequal Treatment

Sentrillion argues that USMS's acceptance of Tyco's "master agreements," but not Sentrillion's "teaming agreements," constituted unequal treatment. It is well established that the agency must treat all offerors equally and consistently apply evaluation factors. E.g., Banknote Corp., 56 Fed. Cl. at 383 ("[The] contracting agency must treat all offerors equally, evaluating proposals evenhandedly against common requirements and evaluation criteria.").

In arguing that USMS treated Sentrillion and Tyco unequally, Sentrillion contends that the agency improperly found Tyco compliant with the requirement for binding partnership agreements even though Tyco did not have binding agreements with its subcontractors. Sentrillion focuses on isolated language in Tyco's master agreement and ignores the context of Tyco's established relationships with its four subcontractors under continuing agreements.

13

Sentrillion seizes on the following language in Tyco's master agreement with its subcontractor in Minnesota:

> [I]ndividual future requests for Subcontractor Services will be initiated by the issuance of [a] written SOW by an authorized Tyco representative and such transactions shall become effective when the SOW is accepted by Subcontractor. Subcontractor acknowledges and agrees that Tyco shall have no obligation to issue any SOWs or otherwise retain Subcontractor to provide goods or services.

AR Tab 54d at 74639; see also id. at 74654, 74741, 74785. Because the "transactions" or "the work" the subcontractor was to perform under the solicitation would not "become effective" until the subcontractor accepted the SOW, Sentrillion contends that the subcontractor could walk away and, thus, Tyco's master agreements were equally as nonbinding as Sentrillion's teaming agreements.

In suggesting that Tyco's subcontractors could reject SOWs, Sentrillion selectively reads the Tyco agreements' language too narrowly and ignores the context of Tyco's ongoing relationships with its subcontractors. The provision does not say a transaction under an SOW will become effective "if" the SOW is accepted by the subcontractor; it says a transaction will become effective "when" the SOW is accepted by the subcontractor. As such, the master agreements' description of the initiation of requests for "Subcontractor Services" could reasonably be read -- as the agency did -- as setting out the protocol for ordering services and the timing of subcontractor acceptance. Such a reading is consistent with the absence of any provision -- like that in Sentrillion's agreements -- suggesting what would happen in the event the subcontractor refused the work. The potential for Tyco's subcontractors refusing an SOW and being replaced by some undisclosed entity was not mentioned in Tyco's master agreements, but such a scenario was clearly set forth in Sentrillion's teaming agreements.

The agency's reading of Tyco's agreements is also compatible with the recognition that the agreements governed ongoing relationships between Tyco and its subcontractors. Tyco's master agreements for subcontracting services with each of its four proposed subcontractors contained the general terms and conditions governing the relationship between Tyco and its subcontractors, referencing upcoming SOWs from Tyco that would delineate the specific services to be provided by the subcontractors. Id. at 74639-46, 74654-62, 74741-51, 74785-95. The agreement covering Minnesota, for example, provided that it would "govern all present and future transactions entered into by Tyco . . . and Subcontractor for the services described in this Agreement . . . ." Id. at 74639; see also id. at 74654, 74741, 74785. Services covered by the master agreements included services encompassed by the solicitation -- "installation, inspection, security guard response or patrol, equipment repair, and/or maintenance services . . . ." Id. at 74639, 74654, 74741, 74785. This express recognition that orders would be ongoing under this continuing relationship supports a reading that SOWs would routinely become effective upon signing by the subcontractor as a matter of procedure, not a reading that the subcontractor would have a contractual right to reject work, leaving Tyco to secure a replacement. In this vein, Tyco's agreements expressly provided that if contract termination occurred before the subcontractor provided services, the subcontractor would be paid $100 "for its undertaking the obligation to perform." Id. at 74639, 74654, 74742, 74785. This language demonstrates that

each Tyco subcontractor had undertaken "the obligation to perform" by virtue of its master agreement.

Further, the record indicates Tyco's subcontractors believed they were "currently under contract" to perform. In the pre-GAO protest submission round, three subcontractors submitted letters entitled "Evidence of Contract to Provide Services" stating that they were "currently under contract to provide maintenance and other security services" as Tyco's subcontractors. AR Tab 52d at 73049, 73062, 73161.

In sum, because Sentrillion's agreements to negotiate with its subcontractors were substantially different than Tyco's master agreements with its subcontractors, Sentrillion has not demonstrated that USMS treated these offerors unequally. See NCL Logistics Co. v. United States, 109 Fed. Cl. 596, 627 (2013) (rejecting plaintiff's argument of unequal treatment in responsibility determination where plaintiff's past performance record was not similar to that of offeror deemed responsible).

**Meaningful Discussions**

Under the FAR, the contracting officer must "discuss with . . . each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond." FAR 15.306(d)(3) (2012). Discussions are intended to "lead offerors into the areas of their proposals which require amplification . . . ." CACI Field Servs., Inc. v. United States, 13 Cl. Ct. 718, 731 (1987) (emphasis omitted) (quoting Furuno U.S.A., Inc., B–221814, 86-1 CPD ¶ 400, 1986 WL 63429, at *3 (Comp. Gen. Apr. 24, 1986)), aff'd, 854 F.2d 464 (Fed. Cir. 1988). However, "agencies are not obligated to conduct all-encompassing discussions, that is, to address in express detail all inferior or inadequate aspects of a proposal . . . ." Id. (quoting Furuno U.S.A., Inc., 1986 WL 63429, at *3). "The substance of the requirement is that the protestor should be given at least one meaningful opportunity to respond to significant weaknesses." Orca Nw. Real Estate Servs. v. United States, 65 Fed. Cl. 1, 9 (2005).

Sentrillion argues that discussions were not meaningful because the agency never told Sentrillion that it had to submit binding subcontract agreements or that teaming agreements would be unacceptable under the Business Licenses and Ability to Meet Response Requirements subfactors. The record does not support this contention. Following GAO's decision recommending that USMS reopen the competition, USMS sent discussion letters to offerors in the competitive range, including Sentrillion and Tyco, and identified proposal elements that offerors had to address in final proposal revisions. AR Tab 53 at 73503-06; AR Tab 53a at 73506.1-06.4; see also AR Tab 47 at 70398. For each proposal section and technical subfactor, USMS explained the agency's pre-GAO bid protest evaluation and indicated whether the offeror needed to amend any section or subfactor in its proposal revisions to obtain an acceptable rating in the next evaluation round. AR Tab 53 at 73504-06; AR Tab 53a at 73506.2-06.3.

In addressing the Business Licenses subfactor, the discussion letters to Sentrillion and Tyco adequately conveyed the need for finalized agreements with team members, stating: "[i]f partnered with other companies to perform the work, then their license or application must be submitted along with evidence of a partnership agreement to provide services" and that "signed

15

partnering agreements must be included at the time final proposals are submitted." AR Tab 53 at 73505; AR Tab 53a at 73506.2. Because the May 7, 2013 discussion letters explicated the requirement for "evidence of partnership," notifying offerors that only "signed partnering agreements" were acceptable, further discussions were not necessary to explain this requirement.[7] Moreover, in the May 7, 2013 discussion letters, USMS specifically told offerors: "[t]his letter constitutes the only discussions that will occur in accordance with FAR 15.306(d), as the USMS intends to make award without further revisions." AR Tab 53 at 73504; AR Tab 53a at 73506.2. Thus, Sentrillion was on notice that no further discussions would be held and that offerors had to submit signed partnering agreements to meet the solicitation's requirements.[8]

## Conclusion

1. Plaintiff's Motion for Judgment on the Administrative Record is **DENIED**.

2. Defendant's Cross-Motion for Judgment on the Administrative Record is **GRANTED**.

3. Intervenor's Cross-Motion for Judgment on the Administrative Record is **GRANTED**.

4. Prior to the release of this opinion to the public, the parties shall review the opinion for competition-sensitive, proprietary, confidential or other protected information. The parties shall file proposed redacted versions of this decision or,

---

[7] In the pre-GAO bid protest round, neither Sentrillion nor Tyco had provided actual partnering agreements.

[8] Plaintiff also contends that USMS's finding that Sentrillion had to provide licenses in all states and territories, irrespective of whether Sentrillion itself proposed to perform work in the location, was inconsistent with the evaluation criteria. Pl.'s Mot. 21. Even if the Court were to agree with this argument, Sentrillion has not shown that this error was prejudicial. See Bannum, Inc. v. United States, 404 F.3d 1346, 1353 (Fed. Cir. 2005). Any such error would not have prejudiced Sentrillion because USMS rationally determined Sentrillion's proposals to be unacceptable for failing to meet the Business Licenses and Ability to Meet Response Requirements technical subfactors. See Statistica, Inc. v. Christopher, 102 F.3d 1577, 1583 (Fed. Cir. 1996) (finding that bidder was not prejudiced where it could not establish a "reasonable likelihood" of being awarded the contract, had the error not been committed).

Sentrillion also quibbles with the agency's articulated concerns with other areas of Sentrillion's proposals which had been deemed acceptable before final proposal revisions, noting that it was unable to make changes in the final round to areas previously found acceptable. Pl.'s Mot. 32-35. The agency did note that given the wholesale changes in Sentrillion's final proposal revisions, it was unclear whether Sentrillion and its partners could still meet previously acceptable areas. But these comments are of no moment here. The agency's venting of these concerns does not alter the reasonableness of the agency's rejection of Sentrillion's proposals for lack of binding partnership agreements.

    in the alternative, file a notice indicating the party's intent not to file proposed redactions, on or before January 22, 2014.

5. The Clerk is directed to enter judgment on the Administrative Record in favor of Defendant and Intervenor consistent with this opinion.

                                    s/Mary Ellen Coster Williams  
                                    **MARY ELLEN COSTER WILLIAMS**  
                                    **Judge**